Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

---

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| CHRISTIANA M. and A.M., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE, UNITED BEHAVIORAL HEALTH, and THE MICHOW COX & MCASKIN LLP GROUP BENEFIT PLAN, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 1:22-cv-00136 <br><br> Magistrate Judge Cecilia M. Romero |

**COME NOW** Christiana M. and A.M., collectively, individually, and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiffs Christiana M. ("Christiana") is a natural person residing in Arapahoe County, Colorado. She is covered by a fully insured plan, The Michow Cox & Mcaskin LLP Group Benefit Plan ("the Plan"), provided through Christiana's employer, Michow Cox & Mcaskin LLP, who is also the plan administrator.

1

2. Plaintiff A.M. ("A.M.") is a resident of Arapahoe County, Colorado. As a beneficiary of her mother's health insurance plan, she received treatment at Elevations Residential Treatment Center ("Elevations"), a licensed residential treatment facility in Syracuse, Utah from February 27, 2019 through July 19, 2019.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the treatment took place in Syracuse, Utah and the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of A.M.'s denied claims from February 27, 2019 through July 19, 2019, pursuant to 29 U.S.C. §1132(a)(1)(B).

6. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

7. Claims were submitted to the Plan by the Plaintiffs for A.M.'s treatment at Elevations.

8. On March 6, 2019, United Behavioral Health ("UBH") sent a letter denying A.M.'s treatment. The denial letter stated, in part:

> Based on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care, it is my determination that no further authorization can be provided from 02/27/2019 forward.
>
> Your child was admitted for treatment of Post traumatic disorder and Bipolar disorder. After talking with your child's doctor's designee, it is noted your child does not meet Guidelines for further coverage of treatment in this setting. Your child appears to be medically stable. Your child appears not to have thoughts to harm-self or harm others. Your child is adherent to her medications. Your child can continue carwe at a lower setting. Your

2

child could continue care in the Mental Health Intensive Outpatient Program setting.

9. On August 27, 2019, Christiana and A.M. (collectively, "the M. Family") submitted a Level One Member Appeal.

10. In the appeal, the M. Family argued that A.M. had suffered severe hallucinations, emotional dysregulation, suicidal ideation, depression, among other mental health issues since the sixth grade.

11. The M. Family described when A.M. began hallucinating a nightmarish creature during daylight hours that was constantly verbally abusing A.M. and telling her it would all stop if she would just kill herself.

12. The M. Family further argued that, beginning in seventh grade, A.M. began lying excessively and self-harming by cutting her legs, stomach, and arms. Once Christiana found out about the self-harm and advised A.M.'s therapist, A.M. became more secretive and hid more from her family and mental health providers.

13. The appeal also advised of A.M.'s first suicide attempt in eighth grade. She attempted to slit her wrists and take copious amounts of over-the-counter pain killers. A.M. became fearful after ingesting the pills and called 9-1-1. It was conveyed to the M. Family that A.M. had taken enough pain killers that, had she not called 9-1-1, she would have died.

14. The appeal outlined a second suicide attempt happened shortly thereafter, while Christiana was driving home from work. While A.M. was in the hospital recovering from the suicide attempt, Christiana formed a safety plan for A.M. and locked all the medications and sharp objects in the house in a closet.

15. The appeal went on to state that, while being watched by a family member, A.M. lied and convinced them to give her access to the locked closet and she formed a suicide plan.

Case 1:22-cv-00136-CMR   Document 2   Filed 10/14/22   PageID.6   Page 4 of 8

Christiana had to leave work early to take A.M. to a walk-up crisis center to be evaluated and she was readmitted to the hospital.

16. The appeal stated that, following her discharge from the hospital, and while waiting for outpatient services to begin for a second time, A.M. ran away from school and unsuccessfully tried to steal razors from a nearby grocery store before going home and attempting to gain access to the locked closet with sharp objects and medications.

17. The M. Family stated that A.M.'s school counselor saw her leave campus and followed her to the store and attempted to engage with her. The school counselor also saw A.M. walking towards her apartment complex and called the police. A.M. was transported to a mental health clinic for evaluation and admitted to a different hospital, Centennial Peaks, for acute inpatient residential care treatment.

18. The appeal argued that A.M. was forced to leave school as her school didn't feel they could handle her safety concerns. Christiana attempted to enroll A.M. in an alternative school but A.M. was bullied severely and threatened to jump off the school roof. This school also said they could no longer accept A.M. as a student.

19. The appeal further argued that A.M. attempted a homebound school with a 504 Plan to graduate eighth grade. She was also attending home-based individual therapy, family therapy, equine therapy, and had behavioral coaching through Excelsior

20. In the appeal, Christiana stated that she found out A.M. had been lying again in eighth grade, this time telling people Christiana had an abusive boyfriend and was kicking A.M. out at night to sleep on the streets in freezing weather.

4

21. The appeal also outlined that A.M. formed two inappropriate attachments, one to a teenage boy who also struggled with excessive lying and suicidal ideation, and one to a young woman youth group leader. Both friendships had to come to an abrupt end.

22. The appeal argued that, throughout ninth grade, A.M. continued to lie and exhibit symptoms of struggling with high anxiety. She attended a short-term wilderness therapy program over the summer between her ninth and tenth grade years.

23. The appeal outlined severe symptoms A.M. exhibited at school that forced her to stay in the hospital for about a week, receiving a barrage of tests to determine the root of the issues. The doctors advised that A.M. was experiencing conversion disorder and her severe trauma and mental health issues were manifesting as physical symptoms.

24. The appeal argued that A.M. was participating in mental health treatment throughout her history of mental health issues.

25. The appeal outlined that A.M. was honest and vulnerable in a session and outlined sexual abuse from three people from her past. Christiana was suitably shocked and, at first, questioned the truth of the accusations because of A.M.'s history of lying. Quickly, though, Christiana told A.M. that she believed her, loved her, and supported her.

26. The appeal stated that, during this time, A.M. had been admitted to multiple mental health units or programs, and attempted many treatment modalities. A.M. had been admitted to almost every program in the Denver metro area, and that's when Christiana realized she needed to look elsewhere for help for her daughter.

27. The appeal outlined that A.M. attended Polaris in Tarzana, California first, and was subsequently transferred to Elevations upon her discharge from Polaris.

28. The appeal outlined multiple letters of medical necessity from A.M.'s treatment team at various programs.

29. In a letter dated September 27, 2019, UBH, operating under the brand Optum, upheld denial for A.M.'s treatment at Elevations. They erroneously addressed the letter to Elevations instead of the members who submitted the appeal.

30. The M. Family submitted a level two member appeal on November 13, 2019, outlining the same issues that weren't addressed in the level one member appeal.

31. In a letter dated January 13, 2020, UBH issued a final adverse benefit determination to the M. Family.

32. The Glossary on pp. 90 of the Plan states the following for Medically Necessary:

…[H]ealth care services that are all of the following as determined by us or our designee:
- In accordance with *Generally Accepted Standards of Medical Practice*.
- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms.
- Not mainly for your convenience or that of your doctor or other health care provider.
- Not more costly than an alterantive drug, service(s), service site or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms…

33. The same page defines Generally Accepted Standards of Medical Practice as follows:

Generally Accepted Standards of Medical Practie are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled Clinical Trials, or, if not available, observational studies from more than one institution that suggests a casual relationship between the service or treatment and health outcomes.

> If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. We have the right to consult expert opinion in determining whether health care services are Medically Necessary…

34. Elevations is licensed and regulated by the State of Utah. Elevations provides services that are less intensive than acute hospitalization and more intensive than outpatient therapy. Elevations qualifies as an intermediate behavioral health facility under the MHPAEA. The Plan must administer benefits for intermediate behavioral health facilities in a way comparable to the administration of benefits for intermediate medical facilities.

35. Elevations meets the Plan's definition of a provider and is licensed by the State of Utah to provide intermediate residential treatment services.

36. The Plan covers intermediate medical and surgical care, including skilled nursing facility services, subacute rehabilitation facility services, and inpatient hospice services.

37. The M. Family exhausted their appeal rights.

## CAUSES OF ACTION

**(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B)) and Claim for Equitable Relief Pursuant to 29 U.S.C. §1132(a))**

2. ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits. 29 U.S.C. §1104(a)(1).

3. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1104(a)(1)(D) and §1133(2).

38. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the M. Family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for A.M.'s claim denial, written in a manner calculated to be understood by the M. Family;  2) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the A.M.'s claim; 3) by developing and relying upon internal practices and policies that improperly restricted coverage in contravention of Plaintiffs' health insurance plans, ERISA, and the Parity Act; and 4) by failing to discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.

**RELIEF**

33. WHEREFORE, the Plaintiffs seek relief as follows:

34. Judgment in the total amount that is owed for A.M.'s medically necessary treatment at Elevations under the terms of the Plan, plus pre- and post-judgment interest to the date of payment;

35. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

36. For such further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 14th day of October, 2022.

G. ERIC NIELSON & ASSOCIATES
  /s/ Laura Nielson
Laura Nielson
*Attorney for Plaintiffs*