THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CHRISTINA M. and A.M., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED HEALTHCARE and UNITED BEHAVIORAL HEALTH, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [28] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING [34] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 1:22-cv-00136 <br><br> District Judge David Barlow |

Before the court are the parties' cross-motions for summary judgment.[1] Plaintiffs Christina M. ("Christina") and A.M. ("C.M.")[2] (together "Plaintiffs") seek to recover benefits from Defendants United Healthcare ("United") and United Behavioral Health ("UBH") (together "United") under 29 U.S.C. § 1132, the Employee Retirement Income Security Act ("ERISA").[3] Having considered the briefing, the court finds that oral argument is unnecessary.[4] For the reasons below, the court grants United's motion and denies Plaintiffs' motion.

---

[1] Def. Mot. for Summ. J. ("Def. MSJ"), ECF No. 28, filed Nov. 13, 2023; Pl. Mot. for Summ. J. ("Pl. MSJ"), ECF No. 34, filed Nov. 13, 2023.

[2] Pl. Mem. in Opp. to Def. MSJ 1, ECF No. 48, filed Dec. 22, 2023 ("Pl. Opp.") notes that "A.M. went by they/them pronouns during their time at Elevations and now uses he/him pronouns and goes by a name beginning with the letter C." Accordingly, the court adopts these initials and male pronouns throughout.

[3] Compl. 7, ECF No. 2, filed Oct. 14, 2022.

[4] *See* DUCivR 7-1(g).

# BACKGROUND

## I.    The Plan

During the relevant period, C.M. was a dependent under his mother's Plan, which is governed by ERISA. The Plan benefits are funded by a group insurance policy issued and administered by United. Benefits are available under the plan when a treatment is medically necessary.[5] A health care service is medically necessary if it is:

- In accordance with Generally Accepted Standards of Medical Practice.
- Clinically appropriate, in terms of type, frequency, extent, service site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease, or its symptoms.
- Not mainly for your convenience or that of your doctor or other healthcare provider.
- Not more costly than an alternative drug, service(s), service site or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.[6]

Under the plan, treatment for mental health conditions, like medical or surgical conditions, is based on participant need; for the most acute needs, participants may need inpatient hospital stays, for less intense needs, a lower level of care is appropriate. The levels of care for mental health conditions include inpatient treatment, residential treatment, partial hospitalization/day treatment, intensive outpatient treatment, and outpatient treatment.[7] To qualify as a residential treatment center ("RTC"), a facility is required to provide a program of treatment under the active supervision of a Physician; maintain a detailed treatment program

---

[5] AR 124, <u>ECF No. 21</u>, filed Oct. 16, 2023. For ease of identification, the court refers to the Bates-numbered administrative record of United's benefits decision with the preceding text provided by the parties, "AR."
[6] AR 206.
[7] AR 134.

requiring the participant's full-time residence and participation; and provide room and board, evaluation and diagnosis, counseling, and referrals to specialized resources on a 24-hour basis.[8]

United evaluates whether treatment in an RTC is medically necessary using the Level of Care Guidelines ("LOCG").[9] The guidelines have a common criterion for all care, which requires that a member's condition cannot be treated in a less intensive level of care.[10] To qualify for admission to an RTC, the LOCG states that a participant must need the structure of a 24 hour per day, 7 days per week treatment setting. Examples of this include:

- Impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.
- Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.[11]

The continuing stay criteria for RTC care requires that treatment is not primarily for the purpose of providing custodial care, which includes:

- Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring, and ambulating);
- Health-related services provided for the primary purpose of meeting the personal needs of the member;
- Services that do not require continued administration by trained medical personnel in order to be delivered safely and effectively.[12]

---

[8] AR 94–95.
[9] AR 1.
[10] AR 2.
[11] AR 15.
[12] AR 16.

## II.    Relevant Medical History

### A.  C.M.'s Childhood

C.M.'s mental health issues surfaced in 2013 when he reported hallucinations.[13] C.M. went to the emergency room to address his hallucinations, after which he started seeing a therapist.[14] He continued to see a therapist throughout 2014, and although he did not experience any severe symptoms, his mother noted changes in his personality and increases in his anxiety.[15] C.M. was hospitalized in 2015 after a suicide attempt and remained in residential treatment for about two weeks.[16] Between September 2015 and November 2017, C.M. was admitted for inpatient treatment related to his mental health on five separate occasions.[17]

In October 2018, C.M. told his therapist and his mother that he had been sexually abused as a child.[18] Shortly after this, in November 2018, C.M. reported he was suicidal and was placed in a residential treatment facility.[19] While receiving this treatment, C.M. began exhibiting manic symptoms and reported hallucinations.[20] Feeling they had exhausted the resources available locally, C.M.'s family began looking into out-of-state treatment programs.[21]

C.M. was admitted to Polaris RTC on December 31, 2018, and received treatment there until February 27, 2019, which United covered.[22] There, he was diagnosed with Posttraumatic

---

[13] AR 703, AR 2005.
[14] *Id.*
[15] AR 2006.
[16] AR 2007, AR 2044.
[17] AR 2373 (Stay at Jefferson Hills September 2015); AR 2410 (Stay at Centennial Peaks 2015); AR 2438 (Stay at Devereux Cleo Wallace 2015); AR 802 (Hospital stay at Children's Hospital Colorado for psychological issues causing physical symptoms in 2017); AR 2552 (Stay at Denver Springs on 72-hour mental health hold in 2017).
[18] AR 2016, AR 2715.
[19] AR. 2665, AR 2667.
[20] AR 2711.
[21] AR. 2018.
[22] AR 3943.

Stress Disorder, Bipolar Disorder, Generalized Anxiety Disorder, and Developmental Disorder of Scholastic Skills.[23] C.M. reported auditory and visual hallucinations including seeing shadows and feeling bugs under his skin.[24] C.M. also reported urges to harm himself and others, but did not have a specific plan or intent to carry out these urges.[25] C.M. once reported choking himself, but stated this was an involuntary muscle movement and he was not recorded as having suicidal or homicidal intent.[26] C.M.'s clinicians reported that he made progress in addressing his symptoms at Polaris but remained vulnerable to mood and interpersonal dysregulation.[27] C.M. did not report having suicidal ideation at any time while at Polaris.[28]

     While receiving treatment at Polaris, C.M. was given a neuropsychological evaluation at the request of his parents and therapist.[29] During the evaluation, C.M. reported he could "kind of function during the day to day, but there's always some obstacle. . . I can kind of muddle through that."[30] C.M. stated that his mood had been more stable at Polaris, the medications he was taking were helping, and that he had not been suicidal "in a long time."[31] The evaluator listed diagnostic impressions of posttraumatic stress disorder, bipolar disorder, generalized anxiety disorder, and developmental disorder of scholastic skills, all of which "seem to have their root in early trauma."[32]

---

[23] AR 2857.

[24] AR 2867, AR 2870, AR 2868, AR 2869, AR 2864 (C.M. reported seeing "demons" and "shadows," hearing "sounds and muffled voices randomly but did not report suicidal or homicidal ideation or psychosis); AR 2865 (C.M. does not report suicidal or homicidal ideation or psychosis).

[25] AR 2870–2871, AR 2873 (stating that C.M. "has thoughts of self harm 'but only really thoughts.' Working on harm reduction. Does not want to self harm.").

[26] AR 2868–2869.

[27] AR 2859.

[28] AR 2848, AR 2858, AR 2879, AR 2881, AR 2883, AR 2885, AR 2887, AR 2888, AR 2890.

[29] AR 2844.

[30] AR 2848.

[31] AR 2849.

[32] AR 2857.

The evaluation recommended treatment to address C.M.'s trauma, continue to stabilize his mood, manage his anxiety, and improve his social skills.[33] The evaluator opined that "[u]ntil [C.M.] has received more treatment and developed improved coping skills, [C.M.] remains at great risk for falling back into the same cycle of social withdrawal, mood dysregulation, and school avoidance."[34] As such, residential treatment was recommended for C.M. to "make academic progress."[35] It was also to include exposure therapy, cognitive behavioral therapy, and eye movement desensitization and reprocessing therapy ("EMDR").[36] C.M. was discharged from Polaris RTC to Elevations on February 27, 2019.[37]

### B.  C.M.'s Residential Treatment at Elevations

Upon admission to Elevations, C.M. was given a risk assessment examination which found no current suicidal ideation or plans for self-harm.[38] He reported that the last time he had these thoughts was December of 2018 and that he did not consider suicide as an option.[39] C.M. further reported that his chief concern was his anxiety.[40]

Elevations also conducted an initial psychiatric evaluation based on interviews with C.M., information from his family, and the neuropsychologist's report conducted while C.M. was at Polaris.[41] The evaluation recommended therapy and medication management, estimating C.M.'s length of stay between three and fourteen months.[42] C.M.'s Master Treatment Plan

---

[33] AR 2859.
[34] *Id*.
[35] *Id*.
[36] AR 1408.
[37] AR 2894.
[38] AR 3667.
[39] AR 3671, AR 3675.
[40] AR 3674.
[41] AR 3674.
[42] AR 3680.

recommended family and individual therapy once per week and group therapy seven times per week to address his trauma and other mental health struggles.[43] The plan also set objectives for C.M. to recover the academic credits he would need to graduate from high school on time.[44] The evaluation also noted that one of the neuropsychologic tests "indicates [C.M.] may exaggerate [his] symptoms."[45]

C.M. struggled to adjust to the program, repeatedly expressing a desire to be home with his family[46] and dealing with some negative interactions with the other residents, including one who bullied him.[47] Beginning on March 2, 2019, C.M. was unable to use his legs[48] to the point that he could not get out of bed on his own, but was given mobility aids and eventually recovered his ability to walk normally.[49] Despite this, C.M. was reportedly in a good mood for much of his time at Elevations and was viewed as a peer leader by staff.[50]

C.M. received a variety of therapeutic interventions, including weekly family and individual therapy in addition to group therapy five to seven times per week.[51] C.M. also

---

[43] AR 3528.

[44] AR 3530.

[45] AR 3677.

[46] See AR 3563 (C.M. "asked mom if [he] could come home because Elevations isn't helping [him]" on 3/20/19); AR 1810 (C.M. cries because he misses his family on 3/21/19); AR 3489 (C.M. reports feeling homesick on 4/4/19); AR 1654 (C.M. "was emotionally upset due to missing [his] mom" on 5/12/19); AR 3037 (C.M. cried "at points in the night due to being homesick" on 7/1/19).

[47] AR 3480 (C.M. "seems to feel annoyed from SD bullying [him] but [he] always says its ok"); AR 3522 (C.M. reports he is "doing better lately" and is open to removing distancing requirements with peer who has been bullying him"); AR 3567 (C.M. says that bullying interventions help "sometimes"); AR 3575 (C.M. states he "can cope with what is in [his] control in the bullying situation"); AR 3578 (C.M. reports having a difficult time with bullying from peer).

[48] A psychiatric progress report several days later observed, "[C.M. has] a history of exaggerating [his] symptoms." AR 3606.

[49] AR 3633, AR 3422.

[50] AR 2966.

[51] AR 1477.

7

received EMDR therapy starting on May 20, 2019.[52] EMDR was generally helpful for C.M. and he reported being in a good mood during and after these sessions.[53] There was one incident where C.M. expressed difficulty with feeling vulnerable after EMDR therapy.[54] However, C.M. could identify resources to cope with the emotions that may emerge during the EMDR process[55] and expressed a desire to continue with the therapy.[56]

C.M.'s progress was not completely linear, and he did have difficulties including instances of migraines,[57] fainting,[58] and feeling withdrawn or dissociated.[59] However, C.M. was able to bounce back from these challenges and was described as motivated and resilient by Elevations staff.[60] Although he was not initially open to considering that the auditory hallucinations he experienced could be his own thoughts,[61] C.M. eventually stated the voices he heard could be his own thoughts.[62] Throughout these struggles, C.M. never reported thoughts of self-harm or harm to others.[63]

---

[52] AR 3183 (Elevations Therapy Note dated 5/28/19 with EMDR session intervention); AR 3189 (Psychiatric Progress Note dated 5/28/19 stating C.M. and his therapist are "doing preliminary work to prepare [him] for EMDR").
[53] AR 1839 (Elevations Therapy Note dated 3/11/19 where EMDR process is explained, C.M. reported mood as 5.5/10); AR 1632 (Elevations Therapy Note dated 5/20/19 where EMDR and DBT interventions were used, C.M. reported his mood as 6/10); AR 1568 (Elevations Therapy Note dated 6/7/19 where EMDR and DBT interventions were used, C.M. reported his mood as 7/10); AR 3006 (Elevations Therapy Note dated 7/5/2019 where EMDR and DBT interventions were used, C.M. reported his mood as 7.5/10); AR 2922 (Elevations Therapy Note dated 7/16/19 where EMDR and DBT interventions were used, no reported thoughts of hurting self or others); AR 2956 (Elevations Therapy Note dated 7/11/2019 reporting that C.M. felt like he could continue EMDR after discharge).
[54] AR 3086.
[55] AR 3183.
[56] AR 3257 (C.M. states desire to do EMDR therapy); AR 3348 (C.M. states goal is to finish EMDR).
[57] AR 3352, AR 3335.
[58] AR 3440.
[59] AR 3439. C.M. often described himself as "disassociated." Elevations staff indicated this was how C.M. described "feeling withdrawn." AR 3078.
[60] AR 3021, AR 3113, AR 3316.
[61] AR 3149.
[62] AR 3028.
[63] AR 3076, AR 3156, AR 3164, AR 3243, AR 3282, AR 3344, AR 3505, AR 3522, AR 3625, AR 3650.

C.M. also made improvement in his education, with teachers reporting excellent schoolwork.[64] Teachers stated that C.M. had a great work ethic and was a positive student in the classroom.[65] C.M. enjoyed many off-campus recreational trips. C.M.'s first off-campus trip was on April 20, 2019, when he went rock climbing.[66] After this, C.M. went biking,[67] hiking,[68] and canoeing.[69] Weeks of conditioning and several off-campus trainings eventually culminated in C.M. completing an overnight camping trip and triathlon.[70] He also participated in cultural outings, like visiting the zoo,[71] a nature center,[72] an amusement park,[73] and going to a parade.[74]

Throughout his time at Elevations, C.M. received continued support from his family and spent time with them both on and off campus. C.M. visited with family in early April.[75] In May, C.M. went on an off-campus trip with his mother.[76] Then, in June, C.M. took a leave of absence to visit family.[77] The family visit was so successful that C.M.'s mother took steps for him to be discharged from Elevations and come home.[78] Elevations staff worked with C.M.'s mother about potential EMDR therapists and aftercare support.[79] C.M. was discharged from Elevations on July 19, 2019, with plans set for ongoing outpatient therapy.[80]

---

[64] AR 3149.
[65] AR 3161.
[66] AR 3409.
[67] AR 3369.
[68] AR 3235.
[69] AR 3331, AR 3022.
[70] AR 2939, AR 2951, AR 3005, AR 3145.
[71] AR 3272.
[72] AR 3175.
[73] AR 3120.
[74] AR 3172.
[75] AR 3480.
[76] AR 3301.
[77] AR 3033.
[78] AR 2959.
[79] AR 1464.
[80] AR 1436, AR 1469, AR 2968.

### III.   Plaintiffs' Administrative Appeals

United denied coverage for C.M.'s treatment at Elevations on March 6, 2019, stating that he did not meet the Guidelines for coverage at the RTC level.[81] This determination was made by Dr. Nilesh Patel ("Dr. Patel"), who found his treatment did not meet the LOCG after a peer-to-peer phone call with C.M.'s treating clinician and reviewing case notes.[82] Dr. Patel wrote that C.M. appeared medically stable, did not have thoughts of harm to himself or others, and was adherent to his medications; therefore, RTC treatment was not medically necessary.[83] Dr. Patel concluded that C.M. could be adequately treated in a less intensive level of care, such as partial hospitalization.[84]

Plaintiffs appealed this decision on August 27, 2019, requesting a full level one member review of the decision denying coverage.[85] The appeal argued that residential treatment at Elevations was medically necessary based on C.M.'s history and the recommendations by previous healthcare providers that he continue residential treatment.[86]

United issued a second denial letter on September 27, 2019, erroneously sending it to Elevations directly.[87] In the letter, United stated that after considering the case notes, level of care guidelines, appeal materials, and C.M.'s medical records, benefit coverage would not be available.[88] United reasoned that C.M. did not require 24-hour care because he had family

---

[81] AR 266 ("Dr. Patel Letter").
[82] AR 3978.
[83] *Id.*
[84] *Id.*
[85] AR 666 ("Level One Appeal Letter").
[86] AR 684.
[87] AR 663.
[88] *Id.*

support, was medically stable, could go on outings and leaves of absence, train for and complete a triathlon, and have his medications adjusted at a lower level of care.[89]

On November 13, 2019, Plaintiffs appealed this decision and requested a level two member appeal, again claiming that RTC care was medically necessary.[90] United replied on December 18, 2019, scheduling a panel to hear Plaintiffs' appeal.[91] The Grievance Panel review was conducted on January 13, 2020.[92] The panel upheld the decision that treatment was not medically necessary for the entirety of C.M.'s stay at Elevations.[93] This decision was based on the level of care guidelines, mental health residential treatment center and common criteria, clinical best practices for all levels of care, and the material submitted by Plaintiffs for the appeal.[94] However, one of United's reviewers voted for a partial overturn, stating that it appeared that some unspecified initial portion of C.M.'s care would have met the guidelines for coverage.[95] All other reviewers found RTC level care was not medically necessary.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on October 14, 2022, asserting claims for benefits under ERISA and a violation of the Parity Act.[96] On November 13, 2023, both United and Plaintiffs filed Motions for Summary Judgment.[97] On December 20, the parties stipulated to the dismissal

---

[89] *Id.*
[90] AR 654 ("Level Two Appeal Letter").
[91] AR 289.
[92] AR 243 ("Grievance Panel Decision Letter").
[93] *Id.*
[94] *Id.*
[95] AR 3991.
[96] Compl. 7.
[97] United Motion for Summary Judgment, ECF No. 28, filed Nov. 13, 2020 ("Def. MSJ"); Plaintiffs' Motion for Summary Judgment, ECF No. 34, filed Nov. 13, 2020 ("Pl. MSJ").

of Plaintiffs' Parity Act claims.[98] The parties filed their oppositions on December 22, 2023,[99] and

filed replies on March 15, 2024.[100]

## LEGAL STANDARD

Generally, summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."[101] Although courts usually "view the evidence and make all reasonable inferences in the

light most favorable to the nonmoving party," the standard is different in an ERISA case where

both parties move for summary judgment.[102] Here, "the factual determination of eligibility for

benefits is decided solely on the administrative record, and the non-moving party is not entitled

to the usual inferences in its favor."[103]

The parties agree the court should apply the de novo standard of review to United's

denial of benefits decision.[104] Under this standard, the court must apply the plain meaning of the

---

[98] Stipulation of Voluntary Dismissal, ECF No. 43, filed Dec. 20, 2023. Plaintiffs agreed to dismiss their claims that "3) by developing and relying upon internal practices and policies that improperly restricted coverage in contravention of Plaintiffs' health insurance plans, ERISA, and the Parity Act; and 4) by failing to discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits." Compl. 8. The parties further agreed that Plaintiffs are no longer pursuing the arguments related to their MHPAEA allegations in their MSJ. Despite this, Plaintiffs now claim that requiring a member to meet acute care criteria to obtain sub-acute treatment violates MHPAEA. Plaintiffs dismissed their Parity Act claim and may not reassert it here. Moreover, they offer no evidence that the criteria for RTC claims are more restrictive than any medical or surgical services. See *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1288 (10th Cir. 2023) (MHPAEA claim requires comparison between mental health/substance abuse coverage and medical/surgical coverage). Accordingly, the court does not address the MHPAEA claims further.

[99] United Defendant's Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 45, filed Dec. 23, 2023 ("Def. Opp."); Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, ECF No. 48, filed Dec. 23, 2023 ("Pl. Opp.").

[100] United's Reply in Support of their Motion for Summary Judgment, ECF No. 66, filed Mar. 15, 2024 ("Def. Reply"); Reply in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 69, filed Mar. 15, 2024 ("Pl. Reply").

[101] Fed. R. Civ. P. 56(a).

[102] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[103] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

[104] Def. MSJ 15; Pl. Opp. 3.

language of the plan and construe its terms strictly against the insurer.[105] In reviewing the benefits determination, the court is limited to the record before United at the time it made its decision.[106]

"The insured ultimately carries the burden of showing he is entitled to ERISA benefits."[107] The insured must show their claim for benefits is supported by a preponderance of the evidence and the denial of benefits was erroneous.[108] "The insurer has the burden of showing that a loss falls within an exclusionary clause of the policy."[109]

## ANALYSIS

Plaintiffs make two sets of arguments, first contending that United failed to comply with ERISA's requirements to follow Plan terms by using the LOCG, then claiming that denial of benefits was improper because C.M.'s care was medically necessary. United argues they complied with all requirements and that C.M. did not require RTC level care.

### I.     Plan Claims

### A.     LOCG Use

Plaintiffs claim the LOCG should not be applied because it is not a part of the Plan's terms.[110] They argue the LOCG are external criteria that were not properly incorporated into the

---

[105] *LaAsmar*, 605 F.3d at 801 (quoting *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 829 (10th Cir. 2008)).
[106] *Gielissen v. Reliance Standard Life Ins. Co.*, No. 21-1377, 2022 WL 5303482, at *4 (10th Cir. 2022). (unpublished) (citing *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002)).
[107] *Hodges v. Life Ins. Co. of N. Am.*, 920 F.3d 669, 680 (10th Cir. 2019) (quoting *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1324 (10th Cir. 2009)) (cleaned up).
[108] *Ray v. UNUM Life Ins. Co. of Am.*, 224 F. App'x 772, 782 (10th Cir. 2007).
[109] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1319 (10th Cir. 2009) (quoting *Pitman v. Blue Cross & Blue Shield of Oklahoma*, 217 F.3d 1291, 1298 (10th Cir. 2000)).
[110] Pl. MSJ 23.

Plan itself.[111] Defendants counter that the LOCG are referenced in the Plan's definition of medical necessity and were validly used to determine benefits.[112]

"ERISA requires plan administrators to enable beneficiaries to learn their rights and obligations at any time."[113] To comply with this requirement, plan administrators must make plan documents "available for examination by any plan participant or beneficiary."[114] "ERISA's disclosure provisions do not require that the plan summary contain particularized criteria for determining the medical necessity of treatment for individualized illnesses."[115] Plan administrators may use their own criteria to determine eligibility for treatment, and these criteria do "not need to be listed in Plan documents to constitute part of the Plan."[116]

Here, the use of the LOCG did not violate ERISA. The guidelines are referenced in the Plan's definition of "medically necessary" with information on how to access the guidelines online or through a phone call.[117] The LOCG were accessible and were sufficiently integrated into the Plan so United could rely on them when making benefits decisions.[118]

Plaintiffs cite *Alexander v. United Behavioral Health* for the proposition that United's LOCG is not adequately incorporated into the Plan.[119] There, the district court stated that the LOCG were not incorporated into the Plan because the guidelines were not referred to in the Plan and so denied United's motion to dismiss for failure to state a claim.[120] Here, unlike in

---

[111] Pl. Opp. 14.
[112] Def. Reply 20; AR 206.
[113] *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1065 (10th Cir. 2020) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S 73, 83 (1995) (internal quotation marks omitted)).
[114] *Id.*, quoting 29 U.S.C. § 1024(b)(2).
[115] *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1292 (10th Cir. 1999).
[116] *Id.*
[117] AR 207.
[118] *L.D. v. UnitedHealthcare Ins.*, 684 F. Supp. 3d 1177, 1191 (D. Utah 2023) (applying United's LOCG).
[119] Pl. Reply 8.
[120] *Alexander v. United Behav. Health*, No. 14-CV-02346-JCS, 2015 WL 1843830, at *8 (N.D. Cal. Apr. 7, 2015).

*Alexander*, the guidelines were incorporated into the Plan. The Plan covers mental health services that are medically necessary.[121] The Plan's definition of medically necessary states that the standards United uses are available online and provides information on how to access them.[122]

Plaintiffs also rely on *Lyn M. v. Premera Blue Cross*, where the Tenth Circuit held that parents of the insured could not be bound to the terms of a policy for which they had no notice.[123] There, the insurance company relied on a document in making their benefits decision that was not provided to members.[124] The document was not disclosed to members, Plan documents that were provided to members did not mention the document, and members had no way of knowing that the document even existed.[125] Here, the LOCG were available to Plaintiffs. Accordingly, these clinical guidelines were sufficiently disclosed.

### B.    LOCG Terms

Plaintiffs next argue the LOCG should not be used because the guidelines narrow Plan terms.[126] They argue that the LOCG limits the scope of the medical necessity definition and requires acute health problems for sub-acute care.[127] Defendants respond that the LOCG does not demand acute symptoms for RTC treatment, but appropriately require conditions that can be

---

[121] AR 134.

[122] AR 206–207.

[123] 966 F.3d 1061, 1067 (10th Cir. 2020).

[124] *Id.* at 1065.

[125] *Id.* at 1065.

[126] Pl. MSJ 23.

[127] Pl. Opp 3. Plaintiffs also argue that United's denial letters demonstrate that they did not use the Plan's terms to deny coverage, claiming United used acute care language to deny sub-acute care. *See* Pl. Reply 12. However, the parties agree on de novo review of the record to determine if RTC care was medically necessary. *See* Def. Opp. 20; Pl. Opp. 3. Therefore, the court does not further consider the content of the denial letters or any associated procedural irregularities.

treated in a less acute environment than an in-patient stay, but need more than out-patient treatment can provide.[128]

The LOCG for RTC care states that treatment should be focused on addressing the member's condition to the point they can be safely treated in a less intensive setting.[129] The member's condition may include acute and chronic symptoms and diagnoses, including behavioral health or medical conditions.[130] For admission to an RTC, the member must require "the structure of a 24-hour/seven days per week treatment setting," which includes conditions that interfere with activities of daily living such that the member's or others' welfare is endangered or problems that are unlikely able to be treated at a less intensive level of care.[131]

Plaintiffs rely on *McGraw v. Prudential Insurance Company of America* to argue that the LOCG impermissibly limited the plan's terms.[132] In that case, the reviewing physician consulted confidential, internal standards for medical necessity that required more than the plan's stated requirements for care.[133] The court found these internal standards unreasonably altered the scope of the plan.[134] In the case at hand, United consulted the readily available LOCG, which Plaintiffs have not shown improperly limit the definition of medical necessity or unreasonably alter the plan. Accordingly, *McGraw* does not support a finding that use of the LOCG here violated ERISA.

---

[128] Def. Reply 24.
[129] AR 15.
[130] *Id.*
[131] *Id.*
[132] 17 F.3d 1253, 1260 (10th Cir. 1998).
[133] *Id.*
[134] *Id.*

## II.    Substantive Claims

Benefits are available under the Plan when the treatment is medically necessary.[135] The plan uses a four-part definition of medical necessity, requiring that the service is in accordance with Generally Accepted Standards of Medical Practice, clinically appropriate, not mainly for the convenience of the insured or their health care provider, and not more costly than an alternative service that is at least as likely to produce equivalent therapeutic results.[136]

United's Residential Treatment Center criteria state that the insured's condition must require the structure of a 24-hour/seven days per week treatment setting, with examples including impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered, or psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered by RTC care.[137] Therefore, the court must evaluate whether residential care should be covered by determining whether 24-hour care was necessary to treat C.M.

Plaintiffs offer four arguments in favor of coverage. First, they state that 24-hour care was medically necessary to treat C.M.'s condition. Second, they claim the provider letters they supplied in the appeals process establish that care was medically necessary. Third, they argue C.M.'s medication management required RTC level care. Finally, they point to one of United's reviewers, Dr. Gruber, voting in favor of partially covering C.M.'s treatment during the level two appeal to establish that the treatment should be covered. The court addresses each issue in order.

---

[135] AR 124.
[136] AR 90.
[137] AR 15.

### A.   C.M.'s Symptoms

There is no dispute whether C.M. needed continued treatment for his mental health and behavioral issues—the question is whether the 24/7 care he received at Elevations was medically necessary under the Plan. Plaintiffs make three arguments to establish that C.M.'s condition made RTC level treatment medically necessary. First, they claim C.M. was likely to harm himself. Next, they claim C.M.'s difficult past made his treatment at Elevations medically necessary. Finally, they claim the symptoms he displayed at Elevations required RTC level care. The court addresses each in turn.

Plaintiffs argue treatment was necessary because C.M. was suicidal in February 2019.[138] However, they do not point to a single psychiatric or therapy note in the record where C.M. states he has thoughts of hurting himself at the relevant time, much less an intention to commit suicide. Instead, they reference United's peer review of the decision to deny coverage for C.M.'s treatment at Elevations, which states that C.M. had no suicidal ideation.[139] Plaintiffs have not shown and the record does not demonstrate that C.M. was considering harming himself or anyone else at any point immediately before or during his treatment at Elevations.[140] Instead, the Elevations records consistently show C.M. was not considering suicide, self-harm, or harm to

---

[138] Pl. Opp. 18; Pl. Reply 3.

[139] AR 3978. Plaintiffs argue that because the letter states there was "no active SI over the last five days," C.M. did have suicidal ideation six days before. This inference is not supported. The peer reviewer was clearly referencing the time frame of requested coverage, and C.M. himself stated that he had not been suicidal since December 2018. There is no other evidence in the record that C.M. was considering harming himself in any way in February 2019.

[140] Although suicidal ideation or a recent suicide attempt are not prerequisites for RTC care, thoughts of harm to self or others often establish the need for 24-hour care. *L.D. v. UnitedHealthcare Ins.*, 684 F. Supp. 3d 1177, 1201 (D. Utah 2023) (24-hour care necessary when insured had daily suicidal ideations, but no longer necessary when they stopped engaging in self-harm and were participating in off-campus trips); *J.S. v. United Healthcare Ins. Co.*, No. 2:21-cv-00483, 2023 WL 5532237, at *17 (D. Utah 2023) (RTC was medically necessary in part because of frequent suicidal ideation); *Rachel S. v. Life & Health Benefits Plan of the Am. Red Cross*, No. 2:14-cv-778, 2020 WL 6204402 at *13 (D. Utah 2020) (reversing denial of benefits when insured had "frequent, intrusive thoughts on how to kill" themself).

others.[141] Therefore, Plaintiffs must establish another reason C.M. needed 24-hour care at the RTC level.

Plaintiff also note that C.M. reported auditory and visual hallucinations during his time at Elevations. For example, on March 12, 2019, C.M. stated "I hear voices and see shadows sometimes."[142] A psychiatric progress note dated April 1, 2019, states "[C.M.] reports have visual hallucinations, but is not distressed by them."[143] By April 11, 2019, Elevations staff were reporting "It sounds like [C.M.'s] 'voices' are [his] own thoughts."[144] This observation is repeated a number of times in Elevations records.[145] None of the Elevations records indicate that these hallucinations/thoughts were about or suggested self-harm or harm to others, or that they impacted C.M.'s safety. Nor is there any evidence to suggest that special precautions or steps were taken to address them. On this record, this is insufficient support to show the LOCG likely were met, and that 24-hour care was necessary during the time in question.

Plaintiffs next argue that C.M. needed 24-hour care because of his traumatic history, pointing to his recently disclosed history of sexual assault to argue that additional RTC care was medically necessary.[146] However, the record does not establish that 24-hour care was necessary for C.M. to process these traumatic events. C.M. reported feeling more "stable" while at Polaris,

---

[141] AR 3671, AR 3650, AR 3625, AR 3612, AR 3591, AR 3590, AR 3575, AR 3567, AR 3563, AR 3583, AR 3534, AR 3522, AR 3516, AR 3505, AR 3483, AR 3481, AR 3467, AR 3463, AR 3434, AR 3426, AR 3417, AR 3401, AR 3374, AR 3371, AR 3361, AR 3357, AR 3344, AR 3322, AR 3303, AR 3301, AR 3282, AR 3274, AR 3254, AR 3243.
[142] AR 3606.
[143] AR 3502.
[144] AR 3448.
[145] *See*, e.g., AR 3149, AR 3189, AR 3413. As noted earlier, C.M. eventually indicated a recognition that the "voices" were "thoughts." AR 3028. In that same progress note, addressing an unrelated symptom, the evaluator also noted C.M.'s "history of assimilating or imitating symptoms of conditions after learning about them." AR at 3028–29.
[146] Pl. Opp. 28.

shortly after he disclosed his childhood sexual abuse.[147] Even the neuropsychological evaluation that recommended additional residential treatment found that C.M.'s "mood is currently stable at Polaris."[148] At Elevations, while C.M. did intermittently experience "dissociation, flashbacks, nightmares, [and] hallucinations"[149] that may have been related to past sexual abuse, the record does not establish that these symptoms could not have been treated at a less intensive level of care, like partial hospitalization.[150] On days when C.M. struggled with these symptoms, he was still recorded as being in a good mood and doing well in the program.[151] Additionally, C.M. did well with trauma-specific therapy, reporting no notable negative reactions, and certainly nothing that suggested a threat to C.M.'s safety or the safety of others.[152] The record does not show that C.M. needed additional 24-hour care due to his history of childhood abuse and resulting trauma.

---

[147] AR 2849.

[148] AR 2858.

[149] Pl. Opp. 28.

[150] AR 2971 (C.M. "seemed to do well tonight following expectations and programming" despite not sleeping well, feeling dissociated, and concerns about future self-harm); AR 3028 (C.M.'s mood was "pretty good," he "decided" not to use a cane anymore, he had "non distressing auditory and visual hallucinations"); AR 3074 (C.M. "processed with peers on how [his] flashbacks affect [him]. Received positive support and good feedback from peers during this time"); AR 3204 (Elevations Youth Outcome Questionnaire with answers that C.M. never or almost never engages in inappropriate sexual behavior, never or almost never thinks about suicide or says he would be better off dead, sometimes complains of nightmares, difficulty getting to sleep, oversleeping, or waking up from sleep too early); AR 3305 (C.M. had headache where he was numb and unable to speak, parent stated this had happened before); AR 3546 (Practitioner Orders on medication change); AR 3572 (C.M. "seemed to disassociate throughout the night as conflict arose on the team" and expressed to staff that he was "frustrated with the situation and that [he] had no part in the issues happening on the team"); AR 3575 (C.M. reported feeling exhausted with panic attacks and flashbacks, but reported "being a 6 on [his] mood scale"); AR 3603 (C.M. "claimed to have a flashback" after being scared by peer, but was able to talk to peer in a conversation that "went really well, and [he] seemed to feel better afterwards"); AR 3674–3679 (Elevations Initial Psychiatric Evaluation stating C.M.'s reasons for admission includes childhood trauma, but his chief complaint is anxiety); AR 3693 (Emotional Support Inquiry Checklist completed by Christiana M. stating that C.M. recently "told us" about sexual abuse between ages of 2 and 10).

[151] AR 2971, AR 3028.

[152] AR 1568, AR 2922, AR 3006.

Plaintiffs similarly argue that C.M.'s reported history of drug use as a child made his care at Elevations medically necessary.[153] However, there is no indication C.M. had used drugs in the years leading up to his admission to Elevations, much less during his time at Polaris or Elevations.[154] C.M. was not diagnosed as having a substance abuse disorder at any time during his treatment and he did not receive substance abuse treatment at Elevations.[155] Therefore, C.M.'s drug history does not establish he needed 24-hour care.

Next, Plaintiffs assert that C.M. needed RTC level treatment because he displayed qualifying symptoms, including being diagnosed with PTSD, bipolar disorder, depression, anxiety, hallucinations, and struggles with emotions.[156] Plaintiffs also point to C.M.'s difficulty making friends or forming bonds with others at Elevations as proof that he needed RTC care.[157]

Although C.M. did struggle with his mental health at Elevations, the preponderance of the evidence does not show that 24-hour care was necessary to address these chronic issues. Plaintiffs do not explain how the symptoms and behaviors C.M. displayed at Elevations made him a danger to himself or others or presented such a disruption in his daily life that full time care was essential.[158] C.M. was receptive to treatment, actively participating in therapy, and was seen as a model student and leader among his peers. There were no reported instances of C.M. endangering himself or others at Elevations. There is no indication that his safety or ability to

---

[153] Pl. Opp. 20.
[154] AR 3677.
[155] AR 3679 (Admission Diagnostic Profile does not include substance abuse disorder).
[156] Pl. MSJ 26.
[157] *Id*.
[158] Plaintiffs point out that on July 10, 2019, C.M. was recorded as "concerned with younger 'parts' of [his] personality returning and worry that if this happens [he] may self harm." *See* AR 1471; Pl. Opp. 29. C.M. did not express any current intent to self-harm and Elevations discharged him shortly after making this statement. Therefore, this isolated expression of concern about the future does not establish that C.M. needed 24-hour care.

function was threatened such that he required 24-hour care.[159] On days where symptoms such as migraines or dissociation were recorded, C.M. was still noted as being in a generally positive and agreeable mood.[160] These chronic mental health and behavioral issues definitely supported continued mental health treatment, but do not demonstrate by a preponderance of the evidence that he needed 24-hour care.[161] Therefore, the greater weight of the record evidence suggests RTC level care at Elevations was not medically necessary for C.M.

### B.  Provider Letters

Next, Plaintiffs rely on letters from two of C.M.'s previous providers to establish that RTC care was necessary. These letters come from Dr. Stevens, Polaris's clinical director, and Dr. Fynboh, a nurse practitioner C.M. saw from March to October of 2018.[162] Both letters state that C.M. needed long-term RTC care to avoid relapsing into destructive thoughts and behaviors.[163] Plaintiffs argue United ignored these letters during the appeals process and only engaged with evidence that supported the denial.[164] United responds that the letters do not establish medical necessity because they were not based on C.M.'s treatment at Elevations.[165]

---

[159] AR 3448.

[160] AR 3575, AR 3603.

[161] *L.D. v. UnitedHealthcare Ins*., 684 F. Supp. 3d 1177, 1200 (D. Utah 2023) (denying coverage for time period in which insured had no self-harm behaviors and participated in off-campus activities).

[162] AR 2020.

[163] *Id.*

[164] Pl. MSJ 27.

[165] Def. Opp. 37. United also points out that an analysis "focusing on whether United's internal reviewers appropriately engaged with the opinions of [the insured]'s treating providers is inconsistent with de novo review." Def. Opp. 36, quoting *J.S. v. United Healthcare Ins. Co*., No. 2:21-cv-00483, 2023 WL 5532237, at *14 (D. Utah 2023). However, "to the extent the record contains opinions from treating providers regarding [C.M.]'s need for continued residential care, those opinions are part of the prelitigation appeal record and, as such, are duly considered below." *Id.* Accordingly, the court considers the letters as part of the record without considering how United evaluated the letters during the appeal.

Plan administrators must perform a full and fair assessment of claims. But "these measures do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition."[166] "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians, nor does it place a heightened burden of explanation on administrators when they reject a treating physician's opinion."[167] When letters from treating physicians are based on care predating admission to an RTC, their recommendations may be outdated and given limited weight.[168] And, of course, the parties have agreed that the court should review the record de novo.

While the provider letters submitted by Plaintiffs in their appeal indicate those treaters believed C.M. could benefit from residential treatment, neither of these providers treated C.M. after he was admitted to Elevations. They recommend treatment based on previous behavior, with no mention of C.M.'s needs while living at Elevations. By the time Jessica Fynboh wrote C.M.'s medical necessity letter, it had been almost a year since she had seen or treated him.[169] Similarly, the letter from Polaris's director only addressed C.M.'s needs in the months prior to his admission to Elevations, with no knowledge of his needs while receiving treatment at Elevations.[170] Dr. Stevens states that C.M.'s past trauma needed to be addressed in RTC care, but

---

[166] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).
[167] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1325 (10th Cir. 2009) (quoting *Black & Decker*, 538 U.S. at 823) (internal quotation marks omitted).
[168] *Christine S. v. Blue Cross Blue Shield of New Mexico*, No. 2:18-cv-00874-JNP-DBP, 2021 WL 4805136, at *7 (D. Utah Oct. 14, 2021) (finding letters submitted by Plaintiffs came from providers whose work with insured predated his admission to Elevations, were therefore based on outdated information, and concluding RTC treatment was not medically necessary); *S.L. by & through J.L. v. Cross*, 675 F. Supp. 3d 1138, 1166 (W.D. Wash. 2023) (giving "limited weight" to provider letter written before insured was admitted to RTC), *cf. D.K. v. United Behavioral Health*, 67 F.4th 1224, 1233 (10th Cir. 2023) (finding United did not adequately engage with opinions of treating physicians at RTC).
[169] AR 2899.
[170] AR 2897.

there is no indication C.M. received trauma-specific therapy at Polaris or for the majority of his time at Elevations.[171] Both letters are evidence that C.M needed additional treatment, but they do not persuasively explain why that treatment could only safely and properly be provided in a residential 24-hour case setting, as opposed to a partial hospitalization program. Consequently, these letters do not establish that C.M. needed RTC level care at Elevations.[172]

### C. Medications

Plaintiffs next argue that treatment was medically necessary because adjustments to C.M.'s medications required 24-hour care.[173] This argument similarly fails to establish that 24-hour care was needed. While some level of monitoring is essential when medications are being adjusted, Plaintiffs have not explained how months of 24-hour care was necessary for C.M. to manage these changes. Indeed, Plaintiffs point to FDA guidance that providers meet with pediatric patients once a week for the first four weeks after a medication change.[174] More importantly, the record offers no evidence that C.M.'s treating team thought 24-hour observation or treatment was necessary for safe adjustment of his medications.[175] There are no instances in the record where C.M. has a negative reaction to a medication that required around the clock monitoring, and his medications remained stable throughout much of his time at Elevations.[176]

---

[171] AR 1430, AR 3183 (EMDR therapy did not start at Elevations until the end of May 2019).

[172] *L.D. v. UnitedHealthcare Ins.*, 684 F. Supp. 3d 1177, 1201 (D. Utah 2023) (upholding denial of benefits because medical necessity letters offered by Plaintiffs recounted events leading to admission to Elevations, not treatment at Elevations).

[173] Pl. Opp. 21. Plaintiffs also argue that United's first reviewer, Dr. Patel, deviated from accepted standards of care so severely that it could be considered malpractice. This is not a medical malpractice case, and the argument does not have any application to Dr. Patel, so the court does not address it further.

[174] Pl. Opp. 24.

[175] AR 3289, AR 3543.

[176] AR 2939, AR 3107.

Accordingly, Plaintiffs have failed to establish that C.M. needed RTC level care at Elevations due to medication changes.

### D.  Level Two Review

Finally, Plaintiffs argue C.M.'s treatment should be covered because one of United's reviewers voted for a partial overturn of the decision to deny benefits.[177] In his notes on the Level Two appeal panel, Dr. Nelson Gruber stated that he voted for a partial overturn because it "appeared that some initial portion of this continued residential care would have met guidelines for coverage."[178] Dr. Gruber offers no explanation of what points in time he thought should have been covered or what factors he considered in making this determination. Furthermore, he offers no reasoning why an undefined initial portion, but not the rest of the treatment, met the guidelines for coverage.

These statements do not establish that C.M.'s treatment at Elevations was medically necessary. C.M.'s mood and conduct were both relatively consistent throughout his time at Elevations, with few deviations from his baseline of being anxious but generally in a good mood; sometimes he was actively engaged with others and at other times was more introspective or withdrawn.[179] There were no major changes in C.M.'s diagnoses. Furthermore, Dr. Gruber does

---

[177] Pl. Opp. 20.

[178] AR 3991.

[179] AR 1567 (C.M. "seemed to be withdrawn"); AR 1631 (C.M. "seemed more withdrawn than the rest of the group"); AR 1734 (C.M. "seemed to be flat and withdrawn throughout the day"); AR 3129 (C.M. "seemed to be distant and withdrawn"); AR 3288 (Noting that it is "unusual" for C.M. to "show intense affect or having enough range in [his] affect to be crying"); AR 3327 (C.M. "seemed to be in a good mood, sometimes appearing more flat and withdrawn"); AR 3351 (C.M. "appeared to be in a good mood"); AR 3360 (C.M. was in a "good mood"); AR 3381 (C.M. "seemed to be in a good mood"); AR 3387 (C.M. expressed being in a "really good mood"); AR 3453 (C.M. seemed to be in a "good mood"); AR 3495 (C.M. seemed to be in a "good mood overall"); AR 3500 (C.M. "seemed more withdrawn and flat while around the team" but appeared to "enjoy lunch" and was "happy to be talking to [his] peers"); AR 3505 (C.M. seemed to be in a good mood); AR 3520 (C.M. was in a good mood); AR 3541 (C.M. seemed to be in a good mood and very engaged); AR 3660 (C.M. "seemed to have a good first week, however staying withdrawn").

not explain why "some initial portion" of care would have met the LOCG criteria or how long

that "initial" period would have been. The court has reviewed the entirety of the record and

cannot surmise what that "initial period" would have been. Accordingly, Dr. Gruber's view on

the level two appeal does not establish that C.M.'s treatment was medically necessary, nor does it

outweigh the views of the other reviewers that found that RTC was not medically necessary at

that time.

In summary, the court has reviewed the totality of the record under a de novo standard.

C.M. received hospitalization or 24-hour residential treatment from November 12, 2018–

February 27, 2019 (with gaps of a few days periodically). The preponderance of the evidence

shows that C.M. had stabilized and was doing well before being discharged from Polaris, the last

of the facilities where C.M. received inpatient treatment prior to Elevations. To that point, these

inpatient treatments had been covered by United.

All agree that C.M. needed additional mental health treatment upon discharge from

Polaris; the question is what level of care was covered by the Plan at that time? An evaluation

requested by C.M.'s parents and Polaris recommended further residential treatment. But the

evaluation's RTC recommendation was partly based on "educational [and] vocational" needs and

suggested it would help address C.M.'s "school avoidance" and would promote "academic

progress." The terms of the Plan do not cover 24-hour residential treatment for these educational

and academic purposes. The evaluation also repeatedly emphasized the need for trauma

treatment, but the record does not show that the trauma treatment required 24-hour care. Instead,

the preponderance of the record evidence suggests that at the time C.M. was discharged from

Polaris, after covered inpatient treatment of about 3 ½ months, that C.M. had made marked

improvement and could have been safely treated in a partial hospitalization program. Additional letters from earlier treaters do not change the balance on this record. And the records from Elevations do not show that RTC care would have been covered under the Plan.

In conclusion, Plaintiffs have not met their burden to prevail on summary judgment. The greater weight of the record evidence does not establish that C.M. needed 24-hour care at Elevations. Because the preponderance of the record evidence does not support coverage for 24-hour residential care at Elevations, summary judgment against Plaintiffs and in favor of United is appropriate.

## ORDER

Accordingly, Defendant's motion for summary judgment is GRANTED.[180] Plaintiffs' motion for summary judgment is DENIED.[181]

Signed September 23, 2024.

BY THE COURT

David Barlow
United States District Judge

---

[180] ECF No. 28.
[181] ECF No. 34.